THE STATE OF OHIO, APPELLANT, *v.* CARROLL, APPELLEE. █

(No. E-76-33—Decided June 10, 1977.)

*Mr. Terry Tataru,* for appellant.
*Mr. Arthur Zeiher,* for appellee.

POTTER, P. J.   Dr. John Louis Carroll, a doctor licensed for more than 43 years to practice medicine in the state of Ohio, was charged by the state medical board with certain acts hereinafter set forth.   He was subsequently given a hearing and found guilty of all of the charges by the hearing officer.   The hearing officer's findings and order were approved and confirmed by a vote of five medical board members.   From this order Dr. Carroll appealed to the Court of Common Pleas of Erie County.   He assigned the following errors:

"1. That the finding of guilty in all charges was not supported by reliable, probative or substantial evidence.

"2. That said findings were unreasonable and not in accordance with law.

"3. That findings were beyond the weight of the evidence."

The Court of Common Pleas on the record as transmitted to it and the briefs and arguments of counsel reversed the board.

Its order was as follows:

"Upon application of the appellant herein from the order of the State Medical Board of Ohio on the 12th day of February, 1975, indefinitely suspending the certificate of appellant to practice medicine and surgery in the State of Ohio and upon briefs of counsel for appellant and the State Medical Board and the Court being fully advised in the premises finds that said appeal is well taken and should be granted and the order of said Board be set aside. It is therefore ordered, adjudged and decreed that the order of the State Medical Board indefinitely suspending the certificate of John L. Carroll, M. D. to practice medicine and surgery in the State of Ohio be and it is hereby vacated, set aside and held for naught."

From this judgment, the board appeals assigning the following error:

"The lower court erred in vacating appellant's order indefinitely suspending the certificate of appellee to practice medicine and surgery in the State of Ohio as that order was supported by reliable, probative, and substantial evidence and was in accordance with law."

We affirm the Court of Common Pleas for the reason that fundamental fair play and due process were denied Dr. Carroll.

The charges placed against Dr. Carroll, as presented in a letter to him, read as follows:

"John Louis Carroll, M. D.
1110 West Washington Street
Sandusky, Ohio 44870
"Dear Dr. Carroll:

"In accordance with Chapter 119, Ohio Revised Code, you are hereby notified that the State Medical Board of Ohio intends to determine whether or not your license to practice medicine should be suspended or revoked under

the provisions of Section 4731.22,[1] Revised Code, for the following reasons:

[1]R. C. 4731.22 at the time of the hearing read:

"The state medical board may refuse to grant a certificate to a person guilty of fraud in passing the examination, or at any time guilty of felony or gross immorality, grossly unprofessional or dishonest conduct, or addicted to the liquor or drug habit to such a degree as to render him unfit to practice medicine or surgery.

"'Grossly unprofessional or dishonest conduct' as used in this section means:

"(A) The employing of any capper, solicitor, or drummer for the purpose of securing patients, or subsidizing any hotel or boardinghouse with like purpose, or the obtaining of any fee on the assurance that an incurable disease can be cured;

"(B) The willful betrayal of a professional secret; but a physician, knowing that one of the parties to a contemplated marriage has a venereal disease, and so informing the other party to such contemplated marriage, or the parent, brother, or guardian of such other party, shall not be held to answer for betrayal of a professional secret nor shall such physician be liable in damages for truthfully giving such information to such other party, or the parent, brother, or guardian of such other party;

"(C) All advertising of medical practice in which extravagantly worded statements intended, or having a tendency to deceive and defraud the public are made, or where specific mention is made in such advertisements of tuberculosis, consumption, cancer, Bright's disease, kidney disease, diabetes, or of venereal diseases or diseases of the genitourinary organs;

"(D) Having professional connection with, or lending one's name to an illegal practitioner of medicine;

"(E) Any division of fees or charges, or any agreement or arrangement to share fees or charges made by any physician or surgeon with any other physician or surgeon, or with any other person.

"(F) The violation of any provision of a code of ethics of a national professional organization as specified in this division. 'National professional organization' means the American medical association, the American osteopathic association, the American chiropractic association, the American podiatry association, and such other national professional organizations as are determined, by rule, by the state medical board. The state medical board shall obtain and keep on file current copies of the codes of ethics of the various national professional organizations. The practitioner whose certificate is being suspended or revoked shall not be found guilty of the violation of a code of ethics of an organization not appropriate to his profession.

"The board, by a vote of not less than five members, may revoke or suspend a certificate for like cause."

"1. On or about June 21, 1974 in United States District Court for the Northern District of Ohio, Western Division, you were adjudged guilty on six (6) counts of a felony, to wit: unlawfully dispensing or causing to be distributed a controlled substance, in violation of Title 21, United States Code, Section 841 (A) (1). Conviction of a felony is grounds for the revocation or suspension of a certificate to practice medicine or surgery, pursuant to Section 4731.-22, Revised Code;[2]

"2. On or about November 4, 1970 you dispensed drugs to Carl Frey/Ken Fichner without a prior physical examination. Such an act constitutes 'gross immorality' as that phrase is used in Section 4731.22, Revised Code. Such an act also constitutes 'grossly unprofessional or dishonest conduct' as that phrase is defined in Section 4731.22(F), Revised Code, because it is a violation of one or more of the following sections of the American Medical Association Code of Ethics: Section 4, Section 7, Section 10;

"3. On or about August 23, 1973 you prescribed drugs to Carl Frey/Ken Fichner without a prior physical examination. Such an act constitutes 'gross immorality' as that phrase is used in Section 4731.22, Revised Code. Such an act also constitutes 'grossly unprofessional or dishonest conduct' as that phrase is defined in Section 4731.22(F), Revised Code, because it is a violation of one or more of the following sections of the American Medical Association Code of Ethics: Section 4, Section 7, Section 10;

"4. On or about October 9, 1973 you prescribed drugs to Carl Frey/Ken Fichner without a prior physical examination. Such an act constitutes 'gross immorality' as that phrase is used in Section 4731.22, Revised Code. Such an act also constitutes 'grossly unprofessional or dishonest conduct' as that phrase is defined in Section 4731.22(F), Re-

---

[2]The conviction of Dr. Carroll in the United States District Court for the Northern District of Ohio, Western Division, was reversed by the United States Court of Appeals, Sixth Circuit, on the basis of an erroneous jury instruction and remanded for a new trial. See *United State* v. *Carroll* (C. A. 6, 1975), 518 F. 2d 187. This case was subsequently dropped by the attorney general.

vised Code, because it is a violation of one or more of the following sections of the American Medical Association Code of Ethics: Section 4, Section 7, Section 10;

"5. On or about October 16, 1973 you prescribed drugs to Carl Frey/Ken Fichner without a prior physical examination. Such an act constitutes 'gross immorality' as that phrase is used in Section 4731.22, Revised Code. Such an act also constitutes 'grossly unprofessional or dishonest conduct' as that phrase is defined in Section 4731.22(F), Revised Code, because it is a violation of one or more of the following sections of the American Medical Association Code of Ethics: Section 4, Section 7, Section 10;

"6. On or about October 16, 1973 you prescribed drugs to federal agent Robert Cole without a prior physical examination. Such an act constitutes 'gross immorality' as that phrase is used in Section 4731.22, Revised Code. Such an act also constitutes 'grossly unprofessional or dishonest conduct' as that phrase is defined in Section 4731.22(F), Revised Code, because it is a violation of one or more of the following sections of the American Medical Association Code of Ethics: Section 4, Section 7, Section 10;

"7. On or about October 16, 1973 you prescribed drugs to federal agent Kenneth McNamara without a prior physical examination. Such an act constitutes 'gross immorality' as that phrase is used in Section 4731.22(F), Revised Code, because it is a violation of one or more of the following sections of the American Medical Association Code of Ethics: Section 4, Section 7, Section 10.

"The American Medical Association Code of Ethics, in pertinent part, provides:

" '*Section 4*

" 'The medical profession should safeguard the public and itself against physicians deficient in moral character or professional competence. Physicians should observe all laws, uphold the dignity and honor of the profession and accept its self-imposed disciplines. They should expose, without hesitation, illegal or unethical conduct of fellow members of the profession.

" '*Section 7*

" 'In the practice of medicine a physician should limit the source of his professional income to medical services actually rendered by him, or under his supervision, to his patients. His fee should be commensurate with the services rendered and the patient's ability to pay. He should neither pay nor receive a commission for referral of patients. Drugs, remedies or appliances may be dispensed or supplied by the physician provided it is in the best interests of the patient.

" 'Section 10

" 'The honored ideals of the medical profession imply that the responsibilities of the physician extend not only to the individual, but also to society where these responsibilities deserve his interest and participation in activities which have the purpose of improving both the health and the well-being of the individual and the community.' "

Pursuant to R. C. 4731.23, the charges were heard before one member of the board, Dr. Roland A. Gandy. His order is as follows:

"In The Matter Of John Carroll, M. D.

"The matter of the citation of John L. Carroll, M. D. under the provisions of Section 4731.22, Revised Code, came up in hearing before me, Roland A. Gandy, Jr., M. D., member of Ohio State Medical Board, on November 19, 1974.

"Upon consideration of all evidence, I make the following findings:

"1. Charge No. 1—Guilty as charged.

"2. Charge No. 2—Guilty as charged.

"3. Charge No. 3—Guilty as charged.

"4. Charge No. 4—Guilty as charged.

"5. Charge No. 5—Guilty as charged.

"6. Charge No. 6—Guilty as charged.

"7. Charge No. 7—Guilty as charged.

"On the basis of the above findings, I make the following order.

"Order

"That the certificate of John L. Carroll, M. D., to prac-

tice Medicine and Surgery in the State of Ohio be and is indefinitely suspended as of March 1, 1975."

"/s/ Roland A. Gandy, Jr., M. D.
Member
The Ohio State Medical Board"

The state medical board subsequently met to consider the findings and order of the hearing officer, Dr. Gandy. It is clear from the transcript of that meeting[3] that the tran-

---

[3]The transcript reads as follows:

"John Carroll, M. D., Sandusky, Ohio.

"Dr. Gandy: I have a finding, an order on that, which is available if you want to consider it now.

"President Ruppersberg: You have the order?

"Dr. Gandy: I gave it to Mr. Lee.

"We had a hearing back on November 19. I finally did receive a copy of the hearing, transcript of the hearing.

"This was a citation of John L. Carroll for selling prescriptions on a controlled drug. There were seven charges listed in the citation, the first of which was the fact that he had been found guilty of a felony in Federal Court.

"The other six were specific incidents of his having sold prescriptions for controlled substances, and after considering the evidence, they found him guilty as charged on each of these seven counts; and on the basis of above finding, they make the following order that the certificate of John L. Carroll, M. D., to practice medicine and surgery in the State be and is indefinitely suspended as of March 1, 1975.

"I think if you want more information on the hearings and so forth, I have a copy of the proceedings here, and I can fill you in on it.

"The charges were specific instances of his selling prescriptions to our investigator and to Federal investigators.

"Dr. Cramblett: There is no question about wilful intent? He wilfully sold prescriptions?

"Dr. Gandy: I feel this is true. There were six instances here, and on one occasion he sold six prescriptions to one man for $60.00, which was not one of the charges we had, but this was brought in in the course of the investigation by the Federal investigator, and it is of interest to us, because that is a felony that he is guilty of on which his conviction stood in the Federal Court.

"Dr. Cramblett: What are the drugs?

"Dr. Gandy: Seconal.

"Dr. Cramblett: What is it?

"Dr. Gandy: Barbiturate.

"Dr. Press: What is your Order?

"Dr. Gandy: His license be suspended indefinitely. This started in 1970, the first time that Mr. Valentine was able to obtain a pre-

script of the evidence from the hearing held by Dr. Gandy. was not read or considered by the members of the board. With proper regard for Dr. Gandy, we find that the proced-

scription, and the last instance was in 1973, so it is over a period of three years that this was going on.

"Dr. Lancione: Is there any limit at all? Just indefinite suspending? That appears very harsh.

"Dr. Gandy: No. You can reapply anytime you want to in reconsidering it.

"Dr. Cramblett: Did he examine the patients?

"Dr. Gandy: No, absolutely did not.

"Dr. Cramblett: I think it should be revoked and not suspended.

"Dr. Brumbaugh: Would you be willing to, or would you think you could state some date that after such and such a time that he could apply? That way, it would give him a definite time to be suspended and a time to reapply. An indefinite suspension is almost equivalent to revocation.

"Dr. Gandy: I was aware of this, and when I made that, I was well aware of that. This is a man that over a period of several years has sold prescriptions, has not examined patients, and Charles Jones did an excellent job of establishing the fact, getting the doctor to admit that he had not examined these patients.

"Dr. Cramblett: Do you think there is a chance of rehabilitation?

"Dr. Gandy: We are dealing with a man that is 67 years old. A man that introduced some evidence that his health may not be exactly what it should be. He wanted to blame all this business on his eschemia that he had. He said he had never done anything like this before, didn't know why he did it, and wanted to blame it upon this.

"I got the impression the man is just plain selling prescriptions, and to make it worse, he said he's not fired up on this business of examinations. He's not like other doctors, that he didn't have an office girl, and he was not keen on examinations.

"I question whether this man should be in practice, whether he was selling the controlled substance prescriptions or not.

"Dr. Press: How long has he been in practice?

"Dr. Gandy: About 40 years.

"Dr. Press: They were all barbiturates, the prescriptions he sold?

"Dr. Gandy: Yes, they were.

"Dr. Brumbaugh: They were all the same drug?

"Dr. Gandy: Seconal, and there were three or four prescriptions he had written. He identified them as being his—he denied that he had written more than one prescription, and when we presented him with the prescriptions, 'Yes, those are mine,' and in each instance he did not examine people, and he even wrote prescriptions for people who weren't present. I did not feel that indefinitely suspending his license would be unfair under the circumstances.

ure followed permitted him to hear the case; rule on the evidence and credibility of the witnesses; determine if the statutes, American Medical Association Code of Ethics,

"Dr. Cramblett: Are the Federal people going ahead with this?

"Dr. Gandy: They have prosecuted him, and it came out, which is not the thing we were there for, but in his testimony, he did not have an attorney representing him. In his bumbling, he brought in the fact that he had been fined $15,000.00, and he said that he had to work, he had $15,000.00 to pay off in a fine, and there were six counts, and he was found guilty on this, and this we did not have him in for, but he bumbled around and got the Federal agent to the point where this was brought in.

"Dr. Brumbaugh: Do you feel he was competent to be at this hearing and answering questions without legal counsel?

"Dr. Gandy: He had his son with him, or two sons with him, and before they got the hearing underway, we explained about having counsel, and even after we were part-way through the hearing and had had some testimony, it is irregular to do this, but I asked—Charlie went off the record, and I asked Charles would it be possible to explain to him what the situation was here, and to see even at this late date if he wanted counsel; and after this was all explained to him on the record, he decided he did not want counsel and would want to continue with the hearing as it was.

"So I don't think it is a case—his son was there, who I feel to be a competent man. His son is a neurosurgeon, and the other son is a dentist, isn't that right, Charles?

"Now, two of them were there with him, and they were willing to advise him, and if they decided in their wisdom they didn't need an attorney, I don't feel that—I feel that he had every opportunity to have legal representation.

"President Ruppersberg: Dr. Lancione has a question.

"Dr. Lancione: Indefinite suspension seems to be an awfully harsh penalty for anything, and it just seems to me that you are pulling a man completely out of practice where definitely he has done wrong, but there may be an awful lot of other patients in his neighborhood or in his district there that depend quite a lot on him, and he is 67 years old, and just because he prescribed some seconal without a physical examination, I think we ought to get into a—

"Dr. Gandy: I think there is a difference here.

"Dr. Lancione:—limited three months or six months suspension.

"Dr. Gandy: I can't agree with you.

"Dr. Lancione: And then have the man examined for mental competency.

"Dr. Gray: I think this, Pete, Sandusky is a town big enough, and he is not the only doctor in the town. If he were, I would say give him

and subjective standards of professional conduct were violated; and make an order and then appear as an advocate without the doctor being present in person or by a representative to convince the board of the validity of his find-

---

several months to wrap up things and get somebody there, possibly several months, like 60 days; but here in Sandusky, people can go to other physicians.

"There are other physicians in Sandusky, and with this being true, I do not feel we are remiss.

"I think we might be doing this man a favor getting him out of practice, maybe getting him to do something he doesn't have the courage to do.

"Dr. Press: Dr. Gandy, I agree with you in a lot of respects, but maybe I'm soft like Dr. Lancione, too, but here is a man who has been practicing 40 years. He may have done something wrong at this particular time.

"I don't think we should cut things off completely. I feel like Dr. Lancione, that we should either make a certain time where he can come back and talk to the Board and let the Board make another decision, but to cut it off, indefinitely or even revoke his license completely, I think is a little bit strong for a man who has 30 or 40 years of practice.

"Dr. Cramblett:    I favor strongly complete revocation.    I will move that the orders and findings of Dr. Gandy be approved and confirmed.

"Dr. Crawford: I second it.

"President Ruppersberg: You have heard the motion. Dr. Crawford seconded it.

"Call for a question. All in favor of the motion signify by saying aye—this will be a roll count.

"Dr. Press?

"Dr. Press: I am opposed.

"President Ruppersberg: Dr. Press opposes.

"Dr. Timmins?

"Dr. Timmins: Aye.

"President Ruppersberg: Dr. Gandy?

"Dr. Gandy: Do I vote? Aye.

"President Ruppersberg: Dr. Crawford?

"Dr. Crawford: Aye.

"President Ruppersberg: Dr. Brumbaugh?

"Dr. Brumbaugh: No.

"President Ruppersberg: Dr. Cramblett?

"Dr. Cramblett: Yes.

"President Ruppersberg: And Dr. Lancione?

"Dr. Lancione: No

ings and order. He then had the privilege to vote to approve his own order. We find without citation that this violates the principle of fair play and due process.[4]

R. C. 4731.23 provides that a hearing may be held by a single member of the board and the finding or order of such member shall be deemed to be the order of the board when approved and confirmed by it.

While we do not hold that this practice alone violates due process, we think the better practice is to appoint an examiner or hearing officer to conduct the hearing. See the Ohio Administrative Procedure Act (R. C. 119.09), relative to adjudication hearings and the appointment of a referee or examiner to conduct the hearing. See also Notes, Cleve. St. L. R. 22 281 at 293. To permit the hearing officer also to become part of the tribunal rendering the final order promotes the evil condemned in *Wong Yang Sung* v. *McGrath* (1950), 339 U. S. 33, wherein it was stated that one of the purposes of the Federal Administrative Procedure Act was to ameliorate the evils resulting from the practice of commingling in one person the duties

---

"Mr. Lee: There were five.

"President Ruppersberg: I vote aye.

"Mr. Lee: Mr. President, Dr. Gandy, I think if you could date this today and sign it, then we can put it in the record.

"Dr. Gandy: Do you want me to just change the date on it?

"Mr. Lee: Yes.

"Dr. Gandy: Just the one copy you want signed, or all of them?

"Mr. Lee: All of them. Correct the date.

"President Ruppersberg: The next case is of W. W. Hunter, M. D., Sandusky, Ohio.

"Dr. Crawford, do you have anything to add about that case?

"Dr. Crawford: No. This man has been hospitalized with Parkinson's disease and was not present at the hearings, and it took quite a little while to get the transcript, and I have read three different orders and changed them all, so I will write up one either tonight or tomorrow for you.

"President Ruppersberg: Thank you very much."

[4]A motion to dismiss this appeal for the reason that the trial court's judgment was not an appealable order under R. C. 119.12 was denied by a divided court on authority of *A. B. Jac., Inc.*, v. *Liquor Comm.* (1972), 29 Ohio St. 2d 139, and *Rrawu, Inc.*, v. *Liquor Control Comm.* (1976), 46 Ohio St. 2d 436.

of prosecutor and judge. It appears that the assistant attorney general who prosecuted the case also attended the board meeting during their deliberations, a courtesy not extended to Dr. Carroll. A reference is made to the attorney's presence but apparently he made no comments for the record. See also *In re Murchison* (1955), 349 U. S. 133, wherein the one man judge and grand jury combination was criticized. The court therein held that a fair trial in a fair tribunal is a basic requirement of due process. See also *Smith* v. *Mayfield Hts.* (1955), 99 Ohio App. 501; *cf. Sorin* v. *Bd. of Ed.* (1974), 39 Ohio Misc. 108; 42 Ohio Jurisprudence 2d 571, Physicians and Surgeons, Section 62.

We note the following statement from 1 Ohio Jurisprudence 2d 507, Administrative Law and Procedure, Section 114:

"Hearing and decision by different officers.—In the absence of a contrary statute, due process or the concept of a fair hearing does not require that the actual taking of testimony be before the same officers as are to determine the matter involved. Where an agency expressly or impliedly has authority to delegate the taking of evidence to less than the whole number of its members or to an examiner or investigator, a hearing by such delegate does not deny due process and is not unfair, *provided the evidence so taken is considered by the agency in making the ultimate decision.*" (Emphasis added.)

See also Annotation 18 A. L. R. 2d 606, 616; *Morgan* v. *United States* (1936), 298 U. S. 468. The transcript of the board's meeting makes it abundantly clear that except for Dr. Gandy no other member of that board considered the evidence.

The issue of due process was raised by this court *sua sponte.* Counsel were given an opportunity to and did file responsive briefs. We find that Dr. Carroll was denied a fair hearing and due process and to this extent appellant's assignment of error that the board's order was in accordance with law is not well taken. We further find that the board did not consider the evidence; therefore, we

cannot find that its order was supported by reliable, probative and substantial evidence.

The assignment of error is found not well taken. The judgment of the Court of Common Pleas is affirmed at appellant's costs.

*Judgment affirmed.*

CONNORS and WILEY, JJ., concur.

WILEY, J., retired, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.